# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 1, 2012

## KEVIN MCDOUGLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0604208, 0604209, 0701739     John Fowlkes, Jr., Judge**

_____

**No. W2011-01430-CCA-R3-PC  - Filed June 27, 2012**

_____

In two separate trials, a Shelby County jury found the Petitioner, Kevin McDougle, guilty of three counts of aggravated robbery, three counts of aggravated assault and one count of unlawful possession of a handgun.  For all the convictions, the trial court sentenced him to an effective sentence of fifty-six years in the Tennessee Department of Correction.  The Petitioner filed separate appeals for his cases, and this Court affirmed the judgments in both cases. _State v. Kevin McDougle_, No. W2009-01648-CCA-R3-CD, 2010 WL 2490752, at *1 (Tenn. Crim. App., at Jackson, June 11, 2010) _no Tenn. R. App. P. 11 filed_; _State v. Kevin McDougle_, No. W2007-01877-CCA-R3-CD, 2010 WL 2219591, at *1-3 (Tenn. Crim. App., at Jackson, May 24, 2010) _no Tenn. R. App. P. 11 filed_.  The Petitioner filed a petition for post-conviction relief, claiming the two attorneys who represented him on each respective case were ineffective.  After an evidentiary hearing, the post-conviction court dismissed the petition.  On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition, maintaining that he received the ineffective assistance of counsel in both cases.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

R. Todd Mosley, Memphis, Tennessee, for the appellant, Kevin McDougle.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; Muriel Malone, Assistant District

1

Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
### A. At Trial

This case arises from the Petitioner's participation in the armed robberies of a grocery store and, on a separate occasion, a taxi cab.[1] Based on this conduct, a Shelby County grand jury indicted the Petitioner, in the first case ("grocery store robbery"), for one count of aggravated robbery and two counts of aggravated assault. In the second case ("taxicab robbery"), a grand jury indicted the Petitioner for two counts of aggravated robbery, one count of aggravated assault, and one count of unlawful possession of a handgun.

On direct appeal, this Court summarized the underlying facts of the grocery store robbery as follows:

> On October 20, 2005, at approximately 5:30 p.m., the [Petitioner] entered Wing Grocery in Memphis and held multiple parties at gunpoint while robbing the store. The owner of the store, Mrs. Yu Hun Huang, was at the register working as a cashier, while her daughter-in-law, Li Yuan Weng, was assisting her. The [Petitioner] entered the store and proceeded to select several items, passing in front of the surveillance camera multiple times. At some point, he approached the register and pulled out his gun. Mrs. Weng then ran to the back of the store and alerted her husband, Duffy Lam. Mr. Lam came toward the front of the store and witnessed the [Petitioner] choking his mother, Mrs. Huang, while pointing a gun at her neck and demanding money. The [Petitioner] left the store after taking $100 in cash and some cigarettes.
>
> After the [Petitioner] left, the victims called the police, and Officer Willard Tate arrived and proceeded to view the surveillance video. Officer Tate also observed that the victims of the crime were very upset and afraid. He recognized the [Petitioner] from the videotape as someone he had seen in his ward. Subsequently, Mrs. Weng and Mr. Lam identified the [Petitioner] from a photographic lineup as the perpetrator of the crime. Mrs. Huang was unable to make a positive identification. The [Petitioner] denied that he was responsible for the crimes.

---

[1] Although the grocery store robbery occurred first, the taxi cab robbery case was the first to be tried.

*Kevin McDougle*, 2010 WL 2490752, at *1. Based upon this evidence, a jury convicted the Petitioner of aggravated robbery and two counts of aggravated assault. For these convictions, the trial court ordered the Defendant to serve an effective sentence of twenty-four years.

On the Petitioner's direct appeal of the taxi cab robbery, this Court summarized the facts of the case as follows:

James McGowan testified that he parked his taxicab at approximately 3:00 p.m. on October 25, 2005, at the intersection of Evergreen Street and Jackson Avenue in Memphis. Roderick Baker and his young son got into the vehicle to talk to Mr. McGowan. Mr. Baker and Mr. McGowan are friends. As they were talking, a man, whom Mr. McGowan identified at trial as [the Petitioner], walked up to the taxicab and asked Mr. McGowan for a ride. Mr. McGowan told [the Petitioner] that he was busy, but he said that he would call [the Petitioner] another taxicab. [The Petitioner] pulled out a gun, pointed it at Mr. McGowan's face, and said, "Give me your money." Mr. McGowan said that [the Petitioner] took approximately one hundred dollars from him. A woman, identified at trial as Erica Newburn, was with [the Petitioner]. Mr. McGowan stated that Ms. Newburn stood with her back to the taxicab during the robbery and watched the area. After he took money from Mr. McGowan and Mr. Baker, [the Petitioner] put the gun in his pants, and he and Ms. Newburn walked away from the taxicab.

Mr. McGowan called 911 and then drove a short distance up the street until he could see [the Petitioner]. [The Petitioner] and Ms. Newburn boarded a public bus traveling eastbound on Jackson Avenue. Mr. McGowan followed the bus, and [the Petitioner] and his companion exited the bus at the intersection of Jackson Avenue and Warford Street, an industrial area. Mr. McGowan observed [the Petitioner] attempt to flag down a passing vehicle with the gun in his hand. The vehicle drove past [the Petitioner] and Ms. Newburn.

Mr. McGowan flagged down a patrol car and told Officer Billy Jackson that [the Petitioner] had just robbed him. Officer Jackson approached [the Petitioner] and spoke to him. Mr. McGowan said that the two men appeared to converse for a short time, and then [the Petitioner] and Ms. Newburn ran away in opposite directions. Officer Jackson chased [the Petitioner], and during the pursuit, [the Petitioner] turned around and pointed his gun at Officer

3

Jackson. Officer Jackson caught up with [the Petitioner] when [the Petitioner] tried to scale a fence. The two men wrestled, and then [the Petitioner] scaled the fence. Mr. McGowan provided a written statement about the incident later that day. On October 26, 2005, Mr. McGowan identified [the Petitioner] as the perpetrator from a photographic line-up.

Roderick Baker testified that he and his young son were sitting in Mr. McGowan's taxicab when a man and a woman walked up and asked for a ride. Mr. Baker identified [the Petitioner] at trial as the man who approached the taxicab. Mr. McGowan told [the Petitioner] that he would call another taxicab. [The Petitioner] started to walk to the rear of the taxicab. He stopped, pulled a pistol out of his pants, and walked back to the front driver's side window. [The Petitioner] said, "You know what this is," and Mr. McGowan handed [the Petitioner] some money. [The Petitioner] pointed the gun at Mr. Baker, and Mr. Baker handed him eighty dollars. Mr. Baker said that [the Petitioner] and Ms. Newburn boarded a public bus, and Mr. Baker got out of the taxicab and drove away in his vehicle. Mr. Baker identified [the Petitioner] from a photographic line-up on October 26, 2005, as the perpetrator of the offense.

Officer Billy Jackson, with the Memphis Police Department, testified that Mr. McGowan flagged him down on October 25, 2005. Mr. McGowan told Officer Jackson that he had just been robbed, and the perpetrator and his female companion were walking up Warford Street. Officer Jackson identified [the Petitioner] at trial as the individual he approached on Warford Street. Officer Jackson asked [the Petitioner] his name and where he had recently been. [The Petitioner] and Ms. Newburn began moving apart from one another. Officer Jackson asked both of them for identification. When neither could produce any identification, Officer Jackson told Ms. Newburn to sit down. [The Petitioner] said that he was not going to go back to jail and began running. Ms. Newburn ran in the opposite direction from [the Petitioner].

Officer Jackson pursued [the Petitioner]. He saw [the Petitioner] pull a black 9 mm gun out of his pants, and Officer Jackson also pulled out his pistol. Officer Jackson stated that [the Petitioner] turned and pointed his weapon at Officer Jackson on three separate occasions during the pursuit. [The Petitioner] then returned the gun to his pants and jumped onto a fence. Officer Jackson pulled him down. [The Petitioner] pulled out his gun again and pointed it at Officer Jackson's chest. Officer Jackson and [the Petitioner] struggled, and Officer Jackson managed to kick the gun away. [The Petitioner] pushed Officer Jackson down and jumped over the fence. Officer

4

Jackson said that [the Petitioner]'s gun contained three rounds of ammunition when the weapon was recovered. Police officers from three different precincts responded to the dispatcher's call about the incident. The officers searched unsuccessfully for [the Petitioner] both by patrol car and by helicopter. Officer Jackson identified [the Petitioner] from a photographic lineup on October 26, 2005, as the man who had pointed a gun at him on Warford Street.

Quinton Maples, an officer with the Memphis Police Department, testified that an anonymous caller provided [the Petitioner]'s location through Crime Stoppers, and an arrest warrant was issued for [the Petitioner] on November 1, 2005. [The Petitioner] was exiting the residence when Officer Maples arrived. Officer Maples asked [the Petitioner] for his name, [the Petitioner] "mumbled something," and then ran. Officer Maples chased [the Petitioner] for approximately one hundred yards and then managed to tackle [the Petitioner] and physically restrain him.

Gail Rankins testified that she is employed by the Criminal Court Clerk's office and maintains the records of the court as part of her job duties. Ms. Rankins testified that according to the court's records contained in file no. 283458, [the Petitioner] was convicted of aggravated burglary on February 3, 2003, pursuant to a negotiated plea agreement. Linda Rapper testified that she was employed by the Shelby County Sheriff's Department as a fingerprint examiner. Ms. Rapper stated that she took [the Petitioner]'s fingerprints prior to trial, and his fingerprints matched the fingerprints in file no. 283458.

*Kevin McDougle*, 2010 WL 2219591, at *1-3. Based upon this evidence, the jury convicted the Petitioner of two counts of aggravated robbery, aggravated assault, and unlawful possession of a handgun. For these convictions, the trial court ordered the Defendant to serve an effective sentence of thirty-two years. The sentences in this case were ordered to served consecutively to the sentences in the grocery store robbery, for a total effective sentence of fifty-six years.

## B. Post-Conviction Hearing

The Petitioner filed a post-conviction petition, claiming that he received the ineffective assistance of counsel in both of his cases. The post-conviction court held an evidentiary hearing, wherein it heard the following evidence: The Petitioner testified that two different attorneys were appointed for each of his cases. In May 2006, at the Petitioner's arraignment on the grocery store robbery, the trial court appointed an attorney ("Counsel I") who represented the Petitioner through the trial on those charges. The Petitioner said that

5

Counsel I never met with him about the case. The Petitioner said that, when the Petitioner was brought to court appearances, Counsel I would not respond to the Petitioner's questions. The Petitioner explained that he sat behind Counsel I and would ask to see various documents and ,when Counsel I would not comply, the Petitioner would "make outbursts in the courtroom" to notify the trial court of the problem.

The Petitioner testified that he requested Counsel I hire an investigator for the case. The Petitioner said that Counsel I responded that, based on the surveillance video recording from the grocery store, an investigator was not necessary. The Petitioner said that he continued to request that Counsel I hire an investigator to no avail.

The Petitioner testified that he requested Counsel I hire a handwriting expert to examine and determine whether the witness signatures on the photographic line-ups were authentic. The Petitioner explained that the witness's signatures that identified him as the perpetrator of the robbery were not spelled correctly, so the signatures must have been forged. The Petitioner said that, when he asked Counsel I about a handwriting expert, Counsel I "waved [him] off," which resulted in the Petitioner making an "outburst" in the courtroom.

The Petitioner testified that he asked Counsel I about a motion to suppress anything related to his identity, but the Petitioner "couldn't get nothing out of him." The Petitioner said that, if Counsel I had done "more follow-up on identification questions[,] it would have had an impact on the case." The Petitioner said that he told Counsel I "how to do his job[,] but he refused to do it." The Petitioner also testified that, at trial, the State's "lead witness" was unable to identify him. Because of this, the Petitioner felt Counsel I should have "objected and put it on the record that [the Petitioner] was never positively identified."

The Petitioner said that he asked Counsel I for the opportunity to wear street clothes to trial rather than jail clothes, but Counsel I never brought him street clothes. The Petitioner said that he wore jail clothes, his feet were shackled, and he wore a "shock belt" throughout the trial. On the day of trial, the Petitioner asked the trial court to allow the Petitioner to represent himself. The Petitioner said that Counsel I responded by telling the trial court to "throw [the Petitioner] out [of] the courtroom and [Counsel I] can go on and get this thing done with."

The Petitioner testified that he wanted to testify at trial. He recalled that the State reviewed its files and announced that there was an aggravated burglary that they could use for impeachment. The Petitioner said that Counsel I then "jumped up and grabbed the folder and says that it might be more that y'all can look into impeach him with." To which the trial court responded, "no, no. We just going to go with the aggravated . . . burglary." The

6

Petitioner said that, after Counsel I's "outburst," he decided not to testify because he felt that Counsel I was "against" him. The Petitioner believed Counsel I's conduct was "inappropriate" and showed that Counsel I "wasn't fighting for me to the fullest."

The Petitioner testified that, at one point, he wanted to plead guilty, even though he was not guilty. Counsel I prepared the guilty plea and, when the Petitioner asked him to explain the paperwork to the Petitioner, Counsel I said that he would not explain "anything" to him. The Petitioner asked the trial court if someone else could explain the plea documents to him, and the trial court said that the case would proceed to trial.

The Petitioner testified that Counsel I represented him on the appeal of his convictions stemming from the grocery store robbery and his convictions stemming from the taxi cab robbery. The Petitioner said that Counsel I told the trial court that "everything went well in this case," so there were no grounds for a motion for new trial, but that he would be challenging the sentencing. The Petitioner said that he told Counsel I that the sentencing was within the trial court's discretion and was not a ground for appeal, but Counsel I sought an appeal only on the issue of sentencing. The Petitioner wanted Counsel I to appeal on issues that related to the trial, but Counsel I maintained that the Petitioner's issues were not grounds for appeal.

On cross-examination, the Petitioner maintained that all three witness signatures identifying him as the perpetrator were forged. The Petitioner agreed that all three of those witnesses testified at trial and two of the three witnesses identified him at trial. The Petitioner agreed that, in front of the jury, he stated that he was guilty, which was what led to the guilty plea agreement that he claimed Counsel I refused to explain to him.

The Petitioner testified that the trial court appointed a separate attorney ("Counsel II")[2] to represent him on the taxicab robbery charges. The Petitioner's main concern regarding Counsel II's representation was her inexperience. The Petitioner said that Counsel II told the Petitioner that his case was her first criminal trial. The Petitioner recalled that, during the trial, the trial court corrected Counsel II for incorrectly attempting to impeach a witness and Counsel II apologized to the trial court, explaining it was due to her lack of experience. The Petitioner said that he also believed Counsel II did not know how to properly address severance issues. In court, Counsel II requested the gun charge be separated from the robbery charges, and the trial court pointed out to Counsel II that she was referencing "the wrong law book."

The Petitioner testified to another occasion during the trial when the State told the jury

---

[2] Counsel II was deceased at the time of the Petitioner's post-conviction hearing.

that the Petitioner was on parole for a violent crime when he committed these offenses. The Petitioner told Counsel II that he was not on parole and she needed to object. Counsel II did not object and instead told the Petitioner that the improper statements would be addressed in the motion for new trial.

The Petitioner testified that Counsel II filed a motion for new trial in his case. Regarding the motion, the Petitioner said, "I can truly say that she was pretty good with writing things and putting things on paper." He agreed that Counsel II adequately addressed the mistakes the Petitioner believed were made during his trial.

The Petitioner testified that Counsel I handled the appeal for his taxi cab robbery case. The Petitioner said that Counsel I did not raise all of the issues from Counsel II's motion for new trial on appeal. The Petitioner believed that there were some valuable challenges in the motion for new trial, and Counsel I neglected to include them on appeal.

Counsel I testified that he is a criminal trial expert and licensed to practice in Tennessee and Arkansas. Counsel I estimated that he had tried five to ten murder cases a year and four to six other major felony cases. He said that most of his trials involve crimes that are Class B felonies or higher.

Counsel I testified that he represented the Petitioner over a two-year period. After the trial on the taxi cab robbery, the trial court appointed Counsel I to take over the appeal in that case and handle the Petitioner's remaining grocery store robbery case that was still to go to trial. Counsel I said that, in order to better prepare for the taxi cab robbery appeal, he sat in on the motion for new trial proceedings. Counsel I said that he met with the Petitioner but could not recall specifically how many times the two met. He said that it was not "frequent" but it was "adequate."

Counsel I testified that he discussed with the Petitioner "early on" that the grocery store robbery case was "very difficult" because the video surveillance footage was "very good quality." Counsel I said that the Petitioner's position on the case was "it just wasn't me." Counsel I explained that, when a defendant takes this approach at trial, it significantly limits the representing attorney.

Counsel I agreed that the Petitioner wanted a handwriting expert to review the photographic line-up identification signatures. Counsel I said that, because all three witnesses who identified the Petitioner were present at the trial and identified their signatures on the photographic line-up, there was no way to justify a request to the trial court for those services. Counsel I said that he initially filed a motion to suppress on the photographic line-ups, but he did not believe the photographic line-ups were "unduly prejudicial" as required

8

to succeed on the motion. Counsel I noted that, in addition to the line-ups, the high quality store surveillance footage was also presented to the jury.

Counsel I agreed that one of the witnesses at trial could not identify the Petitioner in court. Counsel I said that he did not make a motion to dismiss based upon the witness's failure to identify the Petitioner in court because there was no legal basis upon which to do so. Counsel I said that the witness identified the Petitioner in a photographic line-up, and the surveillance video footage was also presented to the jury as evidence of the Petitioner's identity.

As to the Petitioner's claims that Counsel I and the Petitioner had issues communicating with one another, Counsel I said the following:

> The [Petitioner] is very adamant about what he wants, regardless of whether or not there is a legal basis for that relief or for me to take those actions.

> I have - - obviously, I deal with a lot of clients who would be difficult clients. I do take a lot of appointments out of several divisions when they have the clients that they may consider to be difficult clients, because they know that I can, usually, at least - - if not handle them, at least put up with it and not be too concerned about all the Bar complaints that the defendants will file.

> [The Petitioner's] behavior towards me was less than cordial, and, in fact, at some point became hostile. I would dare to venture that somewhere near the end of it, I wasn't even comfortable being in a room with him anymore.

> . . . .

> Throughout the trial, I wasn't even able to sit normally at counsel table. I was having to sit as close to the center of the counsel table as possible to put as much physical distance between me and [the Petitioner], who was escorted by DRT - - Detention Response Team. . . . They had him on a . . . shock belt. And it was at some point during the trial right at the beginning of the trial, he had announced to the Court that if I didn't win, he was going to kill me, and had made several threats, both to the judge and to the courtroom deputies.

> So, his behavior towards me was one that did not promote [a] good attorney/client relationship, but what the relationship that we had was as good

9

as it was going to be with anyone in my opinion, based on my experience with him and what I've seen him do to other attorneys and other judges and deputies. And it was definitely adequate for the representation at trial to make sure that I knew the facts and adequately presented them to the jury.

Counsel I agreed that, during the grocery store robbery trial, the Petitioner stated his guilt in front of the jury. Counsel I recalled that, after the reading of the indictment, the trial court asked "how does the defendant plead?" Counsel I stood and announced the defense was entering a plea of not guilty. To which, the Petitioner responded by standing and saying "I don't know why you're doing that. I'm guilty." The trial court instructed the Petitioner to sit down and wanted to proceed, but Counsel I requested time to discuss a guilty plea with the Petitioner. Counsel I provided the plea agreement paperwork to the Petitioner. After the Petitioner refused to sign the paperwork, they returned to the courtroom and continued with the trial.

Counsel I said that, when he reviewed the taxi cab robbery file, he did not see any way in which Counsel II's hiring of an investigator would have changed the outcome of the case. As to Counsel II's inexperience, Counsel I testified:

> She was inexperienced to the point that this was her first jury trial. She had had some General Sessions trials. I don't remember - - I think they were just civil General Sessions trials. But this was her first criminal jury trial.
>
> . . . .
>
> [W]hen I read the transcript . . . I remember being pleasantly surprised at the representation that he did receive from her.
>
> I found it to be - - there was a mistake made with a cross-examination, I believe. That was a rookie mistake. Everybody makes them when they're rookie time out. You make it once, you look stupid, you get embarrassed, and you never make it again. But, you know, it didn't impact the outcome of the trial, at least in my opinion, especially after having read the full transcript and handled the appeal.
>
> I thought she did - - there was some times in which she actually raised some issues which I thought were very - - I was surprised by how she handled it and thought she did a very good job.

Counsel I recalled an issue in the taxi cab robbery trial where, in closing argument,

the State kept referring to the Petitioner's previous conviction for burglary as a crime of violence. Counsel I said that, as a defense attorney, he "didn't like that" but that it was not "out of line."

On cross-examination, Counsel I testified that he explained to the Petitioner the decisions he made during the course of his representation. Counsel I said that the Petitioner viewed the surveillance videotape footage from the grocery store robbery.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel during both of his trials and on appeal. The State responds that the post-conviction court properly denied post-conviction relief because the Petitioner failed to prove his factual allegations by clear and convincing evidence and show deficient performance of counsel and prejudice in both cases.

In its order denying the Petitioner relief on this issue, the post-conviction court made the following findings:

> This Court has reviewed the entire record, which includes transcripts of trials where Petitioner was convicted. Petitioner complains about the performance of the trial court and his trial attorneys, one of whom is now deceased. From a complete reading of the transcripts and review of the record, it is abundantly clear that [the] Petitioner was one of the most, manipulative, and abusive individuals ever to appear in the courts of Shelby County. Not only did he verbally and physically disrupt proceedings on multiple occasions, including in front of one of his juries, but he also threatened the life of one of his attorneys. This Court also notes that the trial court handled a most difficult defendant with a high degree of professionalism and patience while respecting his constitutional rights.

> After careful consideration, this Court finds that the Petitioner failed to prove his allegations of fact by clear and convincing evidence, and the Petition for Post-Conviction Relief is hereby DENIED.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.

T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Counsel I

The Petitioner asserts that Counsel I was deficient because he failed to hire a handwriting expert to evaluate the witness's signatures on the photographic line-ups and failed to "suppress the evidence." The Petitioner also challenges Counsel I's failure to appeal his issue alleging prosecutorial misconduct during the taxicab robbery trial. The State responds that the post-conviction court properly denied post-conviction relief because the Petitioner failed to prove these allegations by clear and convincing evidence or show prejudice due to Counsel 's representation at trial or in the taxi cab robbery appeal. We agree with the State.

13

As to the Petitioner's ineffective assistance of counsel claims with regard to Counsel I, the post-conviction court made the following findings:

[The] Petitioner testified that he asked [Counsel I] to hire [a] . . . fingerprint analyst to prove that the signatures on the statements by the victims differed from the signatures on the photo line-ups, all of which showed positive identification of [the] Petitioner as the robber. [The] Petitioner asserts that an analyst could have shown that the signatures were different and this discovery could have impacted the outcome of the trial.

[Counsel I] testified that [the] Petitioner believed the police or others may have forged the witness' signatures on the photo arrays. However, the witnesses testified in court that they had, in fact, signed the photo arrays. Thus, there was no issue of forgery. . . .

The only indication that police may have forged witness signatures is [the] Petitioner's bare and unsupported speculation. Based on the record before this Court, obtaining a handwriting expert . . . was unnecessary. Without more than [the] Petitioner's speculation, this Court has no alternative but to find this complaint unfounded and without merit.

. . . .

[The] Petitioner alleges that [Counsel I] failed to file a motion regarding the suppression of a video tape and the photo lineup. [Counsel I] testified that he did not file a motion to suppress because he was positive that the victims were able to identify [the] Petitioner, based on the evidence. Additionally, [Counsel I] asserted that the video image of [the] Petitioner was of good quality and it was not likely to prejudice the witnesses' ability to identify the individual that had robbed them. Thus, a motion to suppress this evidence would have been pointless. As an officer of the court, [Counsel I] would not file motions that were frivolous, or would be supported by perjury. In addition, [the] Petitioner has not said what motions were not filed and how he was prejudiced by trial counsel's inaction.

(Citations omitted).

The evidence in this case does not preponderate against the post-conviction court's findings. Counsel testified that, because all three witnesses identified their signatures on the photographic line-ups, there was no basis on which to request a handwriting expert in the

14

grocery store robbery case. Counsel I testified that, at the beginning of the proceedings, he filed a motion to suppress the photographic line-ups but soon learned that the witnesses were likely going to be able to identify the Petitioner. Additionally, Counsel I's review of the photographic line-ups revealed that the line-ups were not "unduly suggestive," as required to prevail on the motion. He said that, in making his decisions about how to proceed on identification issues, he also considered that the jury would see the "really high quality" surveillance video footage of the Petitioner. Moreover, the Petitioner's specific challenge as to identification is unclear because the Petitioner does not allege in his petitions or his brief specifically what motions should have been filed.

As to the Petitioner's claim of ineffective assistance of counsel based upon Counsel I's failure to raise the issue of prosecutorial misconduct, we first note that appellate counsel is not constitutionally required to raise every conceivable issue on appeal. *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999). The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. *Id*. Counsel I testified that he believed arguments challenging the Petitioner's sentence and the consolidation of the aggravated robbery and aggravated assault charges with the unlawful weapon possession charge were the Petitioner's strongest issues for appeal. As a result, Counsel I made the strategic decision to pursue those claims. Counsel I testified that, "as a defense attorney," he did "not like" the State's comments during closing argument about the Petitioner's previous "violent" conviction, but that he did not believe these comments provided a basis for relief. Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that Counsel was not deficient.

We conclude that the Petitioner failed to show that Counsel's representation was deficient or that he was prejudiced by the representation. Thus, the Petitioner is not entitled to post-conviction relief.

## B. Counsel II

Specifically as to Counsel II's representation during the taxi case robbery case, the Petitioner alleges that Counsel II was deficient in her performance based on her inexperience. The Petitioner contends that Counsel II's inexperience is evidenced by her failure to object to the State's misstatement regarding the Petitioner's prior burglary conviction as a "violent" offense and the improper impeachment of a witness. The State responds that the Petitioner has waived his claim regarding prosecutorial misconduct because he failed to raise it in his petition and that the Petitioner failed to show that Counsel II's lack of trial experience affected the outcome of his case. We agree with the State.

The issue of prosecutorial misconduct was not raised in the Petitioner's post-conviction

petition or argued before the post-conviction court. The post-conviction court did not address this issue in its order denying relief. As such, we agree with the State that this claim is waived for the purposes of appellate review. *See* T.C.A. § 40-30-106(g)(2006) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.").

As to the Petitioner's claim about Counsel II's inexperience, the post-conviction court made the following findings:

> [The] Petitioner alleges that [Counsel II] lacked the knowledge to adequately represent him at trial. [The] Petitioner also asserts that [Counsel II] lacked familiarity with the law surrounding severance and consolidation of the crimes. . . . [Counsel II] is unavailable. However, [Counsel I] stated that in looking over the transcripts, he noticed a mistake on cross examination, impeachment of a witness, but he stated that this was a small mistake that did not impact the outcome of the case in any manner.
>
> . . . .
>
> This Court reviewed the trial transcripts and also notes [Counsel II's] unfamiliarity with the proper use of a prior statement for impeachment. It is the same problem this court has observed with trial lawyers of varying experience. The problem did not stop [Counsel II] from more than adequately cross examining all witnesses called by the state. If, in fact, [Counsel II] was an inexperienced lawyer, it had no impact on [the] Petitioner's trial, and this complaint is denied.

(Citations omitted).

The evidence in this case does not preponderate against the post-conviction court's findings on this matter. Counsel I testified at the post-conviction hearing that, in preparation for the appeal, he reviewed the transcripts and identified a "rookie" error by Counsel II in the impeachment of a witness. He further stated that it was a minor and common mistake that did not impact the outcome of the trial. The Petitioner testified that the trial court addressed the error and then presented nothing further on how this error impacted the outcome of his trial. Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that Counsel was not deficient in this respect.

We conclude that the Petitioner failed to show that either Counsels' representation was

deficient and that he was prejudiced by the representation. Thus, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE